Clarence Eugene LAWSON,
Petitioner–Appellee,

v.

Edward W. MURRAY, Director of the Virginia Department of Corrections, Respondent–Appellant.

No. 86–6763.

United States Court of Appeals,
Fourth Circuit.

Argued March 4, 1987.

Decided Jan. 25, 1988.

Linwood Theodore Wells, Jr., Asst. Atty. Gen. (Mary Sue Terry, Atty. Gen. of Virginia, on brief), for respondent-appellant.

Jessica A. Ginsburg, Third–Year Law Student (Stephen A. Saltsburg, Supervising Atty., University of Virginia School of Law, Post–Conviction Asst. Project, on brief), for petitioner-appellee.

Before RUSSELL and HALL, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

HAYNSWORTH, Senior Circuit Judge:

In a state court in Virginia, Clarence Lawson was convicted of burglary, attempted burglary and larceny. During his trial, he offered in his defense the testimony of Larry Bellamy, who, after briefly giving some testimony tending to exculpate Lawson, cut off cross-examination by invoking his fifth amendment privilege against self-incrimination. Believing that Bellamy's invocation of the privilege substantially impaired the Commonwealth's right to a fair trial, the trial judge struck all of Bellamy's testimony.

After exhaustion of all of his available state court remedies, Lawson sought a federal writ of habeas corpus, alleging that his right to due process had been denied when Bellamy's testimony was stricken.

Upon the recommendation of the United States Magistrate, the district court upheld the claim and directed issuance of the writ. We reverse, since we conclude that, in the circumstances of this case, considerations of fairness to the Commonwealth warranted the action of the trial judge in striking the testimony of the witness.

## I.

In the early morning hours of February 14, 1982, the Norfolk, Virginia, police were alerted to a burglary in progress at the R & W Hawkins warehouse. Two policemen responded. Upon their arrival at the scene, they observed two black males in the back parking lot of the warehouse near a red Mercury automobile, the trunk of which was open. When the officers approached the car, the two men fled. The officers gave chase; one of them caught and arrested Larry Bellamy, and the other man escaped.

A search of the automobile revealed several things that had been taken from the warehouse and a sledge hammer apparently used by the intruders in an attempt to gain entry through a wall into an adjoining liquor store. Upon checking, the policemen learned that the vehicle was registered in the name of James Lawson, a nephew of the petitioner, Clarence Lawson.

About two hours later, at 4 o'clock in the morning, James Lawson's brother, Elliott, telephoned the Norfolk police and reported that the red Mercury automobile had been stolen. He was invited to come to the police station, and, upon arrival there, he changed his story. He signed a statement in which he said that he had borrowed the automobile from James Lawson for the night, and had lent it, in turn, to Bellamy. He also stated that he had received a telephone call from the petitioner, Clarence Lawson, in which Clarence had reported that he and Bellamy had been "jammed" by the police and had been forced to abandon the vehicle. Elliott provided the police with a photograph of the petitioner, Clarence. When the photograph was shown to Officer E.N. Rogers, Rogers identified it as being a picture of the man he had unsuccessfully chased as the man fled from the parking lot earlier that morning.

During petitioner's trial before the court without a jury, a jury trial having been waived, Officer Rogers positively identified petitioner as the man he had seen with Bellamy in the parking lot of the R & W

Hawkins warehouse in the early morning of February 14, 1982, and who had successfully fled and avoided Rogers's pursuit. The Commonwealth called Elliott Lawson as a prosecution witness, but Elliott completely recanted his earlier statement to the police. He testified that he had borrowed the Mercury automobile from James Lawson, but that the vehicle had been stolen while Elliott and his girlfriend were in a club. He denied that he had lent the automobile to Bellamy, and claimed that the policeman had procured his signature to his contrary written statement by coercion.

In defense, Carolyn Williams testified that she was Clarence Lawson's girlfriend, and that Clarence had been with her throughout the morning hours of February 14. Clarence himself took the witness stand to testify that he had not been present in the warehouse parking lot but had spent the entire night with Carolyn Williams. James Lawson testified, routinely, that he had lent the automobile to Elliott. The defense then presented Bellamy as a witness.

After identifying himself and stating his age, defense counsel asked Bellamy only one question. In response, Bellamy testified that at no time between midnight and 10 o'clock in the morning of February 14 had Clarence Lawson been with him.

On cross-examination, the prosecutor asked what Bellamy had been doing that night. Bellamy invoked his fifth amendment privilege against self-incrimination, and the prosecutor made a motion to strike Bellamy's testimony in chief. When the court indicated that it would grant the motion to strike, Bellamy relented and agreed to answer some questions about what he had been doing that morning. He then testified that he had visited Elliott Lawson in Elliott's home for some hours late the previous day, and that the two of them then went riding in the red Mercury automobile that Elliott had borrowed from James. Elliott had dropped Bellamy off on the street near the R & W Hawkins warehouse, and Bellamy cut through the rear parking lot of the warehouse on his way home. He saw no red Mercury automobile in the parking lot. He admitted that he had been picked up by the police in the vicinity of the warehouse, but when asked whether he had been running at the time of his arrest, Bellamy again invoked his fifth amendment privilege.

The prosecution then again made a motion to strike all of Bellamy's testimony, a motion that defense counsel resisted contending that Bellamy had sufficiently described his activities that night to permit his testimony in chief to stand. After concluding that Bellamy had not waived the privilege, and after again being told by Bellamy that the witness wished to invoke the privilege, the court granted the prosecution's motion to strike the testimony.

After conclusion of the bench trial, the court found Clarence Lawson guilty of burglary and larceny of the warehouse, and attempted burglary of the liquor store.

On the basis of a recommendation by the United States Magistrate, the district judge concluded that the trial judge's striking of Bellamy's testimony worked an unconstitutional denial of the defendant's right to present witnesses in his defense.

## II.

When a prosecution witness cuts off cross-examination by invoking the fifth amendment privilege against self-incrimination, the criminal defendant's constitutional right of confrontation is directly implicated. Moreover, when a defense witness in a criminal prosecution cuts off cross-examination by invocation of the privilege, the defendant's constitutional right to present witnesses in his own defense is implicated. Indeed, the district court directed issuance of the writ upon the ground that striking Bellamy's testimony was an unwarranted curtailment of the defendant's right to present witnesses in his own defense.

The defendant's right to present witnesses in his own defense, however, does not carry with it the right to immunize the witness from reasonable and appropriate cross-examination. Neither a defendant's right of confrontation nor his right to

present witnesses in his own defense is so absolute as to require a subversion of even more fundamental principles that animate our adversary system. "[A]rriving at the truth is a fundamental goal of our legal system," *United States v. Havens,* 446 U.S. 620, 626, 100 S.Ct. 1912, 1916, 64 L.Ed. 2d 559 (1980), and cross-examination is an indispensable tool in the search for truth. *See Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *United States v. Caudle,* 606 F.2d 451, 457 (4th Cir.1979). The fifth amendment provides no immunity from cross-examination for a witness who elects to testify; it is not a "positive invitation to mutilate the truth a party offers to tell." *Brown v. United States,* 356 U.S. 148, 156, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958).

■ Striking the testimony of a witness is a drastic remedy. It is not to be lightly done. Any action by the court may be inappropriate when a witness invokes the fifth amendment privilege to avoid cross-examination on purely collateral matters. Even when the witness refuses to answer questions relevant to matters at issue, striking only portions of the testimony may be the more reasonable remedy if that can avoid the unfairness created by the avoidance of full cross-examination, but the purpose of cross-examination is to test the credibility of the witness and the truthfulness of his earlier testimony. Striking all of the testimony of the witness may be the only appropriate remedy when refusal to answer the questions of the cross-examiner frustrates the purpose of the process. *United States v. Lord,* 711 F.2d 887, 892 (9th Cir.1983).

The principle is consistent with that applied when the privilege is invoked by a witness for the prosecution. *See, e.g., United States v. Phillips,* 664 F.2d 971, 1027–28 (5th Cir. Unit B Dec. 1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *Dunbar v. Harris,* 612 F.2d 690, 692–93 (2d Cir.1979); *see also United States v. Smith,* 342 F.2d 525, 527 (4th Cir.1965), *cert. denied,* 381 U.S. 913, 85 S.Ct. 1535, 14 L.Ed.2d 434 (1965). Important public policy protects even the prosecution's right to fair trials and the pursuit of truth, so that a similar principle should govern whether the recalcitrant witness was offered by the prosecution or by the defendant. *See United States v. Lord, supra,* 711 F.2d at 892, *State v. Pew,* 39 Or.App. 663, 593 P.2d 1198 (1979).

■ The principle was properly applied by the trial judge. Bellamy was clearly attempting to say just enough to exonerate Clarence Lawson without implicating himself. In the process, he was trifling with the truth, as the prosecutor well knew, because Bellamy had been caught in the act of fleeing from the scene in the presence of the red Mercury automobile. The prosecutor was entitled to closely examine the witness in that area and thus to expose to the fact finder Bellamy's falsification. Bellamy's refusal to answer questions so relevant and pertinent left the trial judge with no alternative but to strike Bellamy's entire testimony.

Lawson suggests that before striking Bellamy's testimony, the trial judge should have permitted the cross-examination to proceed, but permitting Bellamy to refuse to answer those questions as to which Bellamy claimed the privilege. That is essentially what occurred, however. The cross-examiner was entitled to question the witness closely, and the witness had clearly demonstrated his refusal to answer the most specific questions about what happened at the time of the burglary.

Moreover, Bellamy's direct testimony was so brief it did not admit to any splitting. It was necessary to strike it all or nothing.

### III.

■ For the first time in this case, Lawson contends that Bellamy had waived his fifth amendment privilege and should have been compelled to answer the cross-examiner's questions under the threat of punishment for contempt. That contention, however, is directly contrary to Lawson's position at trial where he supported Bellamy's invocation of the privilege but sought to retain the benefit of Bellamy's testimony

upon the ground that Bellamy had answered sufficient questions on cross-examination to avoid the need for striking all of his testimony.

This contention is simply not open to Lawson in this federal court, for there has been no semblance of exhaustion of available state court remedies. It was not mentioned on his direct appeal or in the state habeas proceedings.

### IV.

The judgment of the district court directing issuance of the writ is reversed.

REVERSED.