Angela COMBS, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 1998–SC–1124–DG.

Supreme Court of Kentucky.

May 16, 2002.

As Amended May 24 and June 10, 2002.

John Kevin West, Charles E. Beal, II, McCoy and West, Lexington, Counsel for Appellant.

A.B. Chandler, III, Attorney General, Perry T. Ryan, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

KELLER, Justice.

## I. INTRODUCTION

A Fayette Circuit Court jury found Appellant guilty of two (2) counts of First–Degree Trafficking in a Controlled Substance (Cocaine) and recommended that she serve consecutive terms of five (5) years for each offense. The trial court sentenced Combs to ten (10) years imprisonment in accordance with the jury's recommendation, and the Court of Appeals affirmed Appellant's convictions on direct appeal. Appellant sought, and this Court granted, discretionary review to address Appellant's contention that the trial court erred when it excluded the testimony of a defense alibi witness because that witness intended to invoke her Fifth Amendment privilege against self-incrimination in response to certain questions.

## II. BACKGROUND

The Fayette County Grand Jury returned a two (2) count indictment against Appellant charging her with First–Degree Trafficking in a Controlled Substance (Cocaine) on two (2) occasions in the Fall of 1996:

COUNT 1:

On or about the 5th day of November, 1996, in Fayette County, Kentucky, the above named Defendant committed the offense of trafficking in a controlled substance first degree by unlawfully selling or transferring a quantity of crack cocaine.

COUNT 2:

On or about the 31st day of October, 1996, in Fayette County, Kentucky, the above named Defendant committed the offense of trafficking in a controlled substance first degree by unlawfully selling or transferring a quantity of crack cocaine. . . .

The charges stemmed from two (2) "controlled-purchases" made by a confidential informant working with the Lexington–Fayette Urban County Police Department. The Commonwealth alleged at trial that Appellant had engaged in hand-to-hand transactions in crack cocaine with the confidential informant at Appellant's home, and Appellant defended against the charges by alleging that she was not at home on the occasions the Commonwealth alleged that she was dealing in crack co-

caine. Appellant's alibi defense consisted of testimony that she was shoplifting on the October 31, 1996 occasion and that she had an appointment at the home of a hair stylist on the November 5, 1996 occasion.

At trial, the Commonwealth introduced testimony from: (1) Detective Pete Ford, who testified that, on October 31, 1996 at about 12:30 p.m. and again on November 5, 1996 at about 4:25 p.m., he supplied a confidential informant with money to purchase illegal drugs at Appellant's residence. Detective Ford testified that on each occasion, the informant entered Appellant's residence and returned with a substance that the state forensic laboratory later determined was crack cocaine. Detective Ford further testified that on each occasion he personally observed Appellant as she walked the informant to the door; (2) a representative from the Lexington–Fayette Urban County Government Housing Authority who verified that Appellant leased the residence where these controlled purchases allegedly took place; and (3) the confidential informant, who verified Detective Ford's account of the controlled purchases and testified that she often worked as a paid confidential informant for the police.

The defense presented testimony from: (1) a K–Mart Loss Control Manager who laid a foundation for the introduction of documentation concerning the detention for suspected shoplifting of two (2) African–American women on October 31, 1996 at the K–Mart on New Circle Road in Lexington. One of the detainees had signed the documentation "Teresa Lewis" after first starting to sign her name with the letter "A."; (2) Yvette Leigh, who testified that she had styled Appellant's hair for years and had been styling her hair at the time of the November 5, 1996 cocaine purchase. Leigh explained that she specifically remembered the day because it was

Election Day and because she had done Appellant's hair during the afternoon instead of the evening when she typically did Appellant's hair; and (3) Appellant herself, who denied participation in any cocaine transactions and denied being at her residence on the dates and times of the alleged controlled drug purchases. Appellant testified that, at the time of the October 31st occasion, she was detained at a Lexington K–Mart store after she was caught shoplifting and that, on the November 5th occasion, she was at Yvette Leigh's house for a hair appointment. Appellant also testified that other people had access to her apartment on the dates in question and provided a motive for the confidential informant to fabricate charges against her by testifying that she and the informant did not get along.

The sole issue on appeal concerns the trial court's ruling that precluded Tracy Williams from testifying on behalf of Appellant. During his opening statement, Appellant's trial counsel stated that Williams would testify that on the afternoon of October 31, 1996, she and Appellant had been shoplifting at K–Mart and Appellant had been detained by store authorities. Appellant's trial counsel initially called Williams as the first witness for the defense. Based upon counsel's opening statement representations concerning the testimony expected from Williams, before Williams testified, the trial court placed her under oath and advised her of her constitutional rights outside the presence of the jury. Although Williams initially stated that she had no need for an attorney, she later reconsidered that decision, and a Fayette County Legal Aid public defender was summoned to advise her. After consulting with the attorney, the defense and the Commonwealth each questioned Williams, and Williams invoked her Fifth Amendment right against self-in-

crimination on two (2) occasions during the questioning:

Defense: Could you state your name please?

Williams: Tracy Lynn Williams

Defense: Do you know Angela Combs?

Williams: Yes, sir, I do.

Defense: Were you with Angela Combs on October 31, 1996?

Williams: Yes, sir, I was.

Defense: Where were you with her at?

Williams: At K–Mart on New Circle Road.

Defense: What were you all doing? And you may need to speak with [your attorney].

Williams: We were shopping.

Defense: You were shopping?

Williams: Yes, sir.

Defense: Do you know if Angela took any, or attempted to take any items there at the K–Mart?

Williams: I would not like to answer that question because I might incriminate myself.

Defense: Do you know if Angel was detained there at the K–Mart?

Williams: Yes, sir, I do.

Defense: That's all I have, Your Honor.

Comm.: Ma'am, what was your involvement?

Williams: I would like not to answer that on the grounds I may incriminate myself.

Comm.: Did Ms. Combs drive there with you present in the car?

Williams: Yes, sir, she did.

Comm.: That's all I have.

After the examination, the Commonwealth moved the trial court to preclude Williams from testifying because of her intention to invoke a privilege with respect to some questions, but not others:

It was our motion to preclude this witness from testifying. It's the Commonwealth's position that if they are going to assert the privilege then they can't testify to anything other than name or date. They can't selectively choose which questions they are going to answer and which questions they are not going to answer. By them stating that they were at a certain place and time, I think the Commonwealth is unfairly prejudiced by not being able to ask them why they were there and what they were doing there, what was their vantage point, things of that nature.... Essentially, once a witness takes the stand and invokes his Fifth Amendment privilege, that's essentially it. You can't ask any further questions and there is no support within this State and no federal support that the Commonwealth is aware of that would allow a witness to selectively choose which questions they are going to answer.

Defense counsel argued that "in this particular case, given the facts and circumstances, it is necessary for us to be able to ask the witness the non-inculpatory questions ... because it will effectively establish the alibi defense which my client is relying on and preventing her to do that would violate her Fifth and Sixth Amendment rights." The Commonwealth argued in response that Williams's assertion of the privilege effectively prevented them from cross-examining the witness. The trial court agreed with the Commonwealth's argument and granted the motion to preclude Williams from testifying:

[S]imply by taking the stand, this witness would have to waive her Fifth Amendment privileges and we can't piecemeal what she is going to waive and what she is not going to waive.... [T]he court will allow her to assert her

Fifth Amendment and not allow her to be called as a witness in this case.

The issue before this Court, therefore, is whether the trial court erroneously precluded Williams from testifying and thereby prejudiced Appellant.

## III. ANALYSIS

### A. EXCLUSION OF WILLIAMS'S TESTIMONY

■ This Court has recognized that "neither the prosecution nor the defense may call a witness knowing that the witness will assert his Fifth Amendment privilege against self-incrimination,"[1] and we have applied this black-letter law in cases where a witness invokes the privilege in order to avoid answering *any* substantive questions.[2] However, in *Commonwealth v. Gettys*,[3] the Court of Appeals recognized that the black-letter principle may be inapplicable when a preliminary inquiry reveals that the witness would invoke the privilege in response to some questions, but could otherwise give relevant testimony.[4] The *Gettys* Court recognized that a trial court could allow the witness to testify, but limit the scope of cross-examination to avoid unrelated topics upon which the witness would invoke the privilege.[5]

The federal courts have addressed analogous issues in three (3) contexts: (1) where a defense witness invokes the privilege as to one or more cross-examination questions from the prosecution (implicating the defendant's Sixth Amendment right to compulsory process);[6] (2) where a prosecution witness invokes the privilege as to one or more of the defense's cross-examination questions (implicating the defendant's Sixth Amendment confrontation rights);[7] and (3) where the defendant tes-

1. *Clayton v. Commonwealth*, Ky., 786 S.W.2d 866, 868 (1990).

2. *Id.* at 868 ("The witness, with his attorney present, and on his advice, gave his name and address, and then invoked the privilege."); *Commonwealth v. Brown*, Ky., 619 S.W.2d 699, 701–703 (1981), overruled on other grounds, *Murphy v. Commonwealth*, 652 S.W.2d 69 (1983) ("At a pre-trial hearing, Owens and Furman indicated that they would refuse to testify on the grounds of their ... privileges against self-incrimination.... [T]he trial court rightly decided that the Commonwealth not be allowed to call them as witnesses because the Commonwealth was aware that they would assert their privileges against self-incrimination.").

3. Ky.App., 610 S.W.2d 899 (1981).

4. *Id.* at 901.

5. *Id.*

6. *See United States v. Gary*, 74 F.3d 304 (1st Cir.1996); *United States v. McKneely*, 69 F.3d 1067 (10th Cir.1995); *Denham v. Deeds*, 954 F.2d 1501 (9th Cir.1992); *United States v. Negrete–Gonzales*, 966 F.2d 1277 (9th Cir.

1992); *United States v. Norwood*, 931 F.2d 297 (5th Cir.1991); *United States v. Esparsen*, 930 F.2d 1461 (10th Cir.1991), cert. denied, 502 U.S. 1036, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992); *Lawson v. Murray*, 837 F.2d 653 (4th Cir.1988), cert. denied, 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988); *United States v. Lord*, 711 F.2d 887 (9th Cir.1983).

7. *See* "Annotation: Propriety of Court's Failure or Refusal to Strike Direct Testimony of Government Witness Who Refuses, On Grounds of Self–Incrimination, to Answer Questions on Cross–Examination," 55 A.L.R. Fed. 742 (2001); *United States v. Curry*, 993 F.2d 43 (4th Cir.1993); *United States v. Berrio–Londono*, 946 F.2d 158 (1st Cir.1991); *United States v. Zapata*, 871 F.2d 616 (7th Cir.1989); *United States v. Humphrey*, 696 F.2d 72 (8th Cir.1982), cert. denied 459 U.S. 1222, 103 S.Ct. 1230, 75 L.Ed.2d 463 (1983); *United States v. Nunez*, 668 F.2d 1116 (10th Cir.1981); *United States v. Seifert*, 648 F.2d 557 (9th Cir.1980); *United States v. Williams*, 626 F.2d 697 (9th Cir.1980); *United States v. Demchak*, 545 F.2d 1029 (5th Cir.1977); *Fountain v. United States*, 384 F.2d 624 (5th Cir.1967), cert. denied 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968); *United*

tifies in his or her own defense, but invokes the privilege as to one or more of the prosecution's questions on cross-examination (implicating the defendant's Fifth Amendment right to testify in his own defense).[8] Although there are different constitutional concerns at stake in each situation, the federal courts have recognized that prohibiting a witness from testifying or striking the entirety of a witness's testimony is a "drastic remedy not lightly invoked," [9] but that may be necessary "when refusal to answer the questions of the cross-examiner frustrates the purpose of the process." [10] As such, the federal courts have recognized the importance of cross-examination to the truth-seeking adversarial process:

> Whether a witness is telling the truth or lying is as important as what the witness says, and there is no better way than cross examination under oath to help a jury decide whether it is being lied to:
>
>> The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience.
>>
>> Not even the abuses, the mishandlings, and the puerilities which are so often found associated with cross ex-

amination have availed to nullify its value. It may be that in more than one sense it takes the place in our system which torture occupied in the mediaeval system of the civilians. Nevertheless, it is beyond any doubt the greatest legal engine ever developed for the discovery of truth. However difficult it may be for the layman, the scientist, or the foreign jurist to appreciate this its wonderful power, there has probably never been a moment's doubt upon this point in the mind of a lawyer of experience.

V Wigmore on Evidence § 1367 (Chadbourne rev. ed.1974). A person's story is not much use to a jury if the jurors are denied the information they need to evaluate how likely it is that the story is true.[11]

■■■ A defendant's Sixth Amendment right to "have compulsory process for obtaining witnesses in his favor" [12] does not transcend the adversarial system and defense witnesses must be subject to the prosecution's cross-examination:

> Where a defense witness refuses to answer questions that go to the heart of the direct testimony on a central issue, however, the truth-seeking function of the court is impaired. "The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth

States v. Cardillo, 316 F.2d 606 (2nd Cir. 1963), cert. denied 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963).

**8.** See Williams v. Borg, 139 F.3d 737 (9th Cir.1998), cert. denied 525 U.S. 937, 119 S.Ct. 353, 142 L.Ed.2d 292 (1998); United States v. Bartelho, 129 F.3d 663 (1st Cir. 1997), cert. denied 525 U.S. 905, 119 S.Ct. 241, 142 L.Ed.2d 198 (1998); United States v. Montgomery, 998 F.2d 1468 (9th Cir.1993).

**9.** United States v. McKneely, supra note 6 at 1076 (citing Lawson v. Murray, supra note 6 at 656.). See also United States v. Lord, supra note 6 at 892 ("[S]triking the witness's entire testimony is an extreme sanction.").

**10.** Lawson v. Murray, supra note 6 at 656.

**11.** Williams v. Borg, supra note 8 at 741.

**12.** U.S. CONST. amend. VI.

Amendment as a justification for presenting what might have been a half-truth. Where a defense witness's invocation of Fifth Amendment protection against self-incrimination amounts to a refusal to be cross-examined, the testimony cannot be considered reliable.[13]

However, the federal courts have recognized the necessity of accommodating valid assertions of privilege by defense witnesses, and have found the "drastic remedy" of precluding testimony appropriate only where a witness's invocation of the privilege frustrates cross-examination on issues material to the witness's testimony:

> When cross-examination is precluded only with respect to collateral issues, the Sixth Amendment does not require the court to strike the witness's testimony.

> When cross-examination on material issues raised on direct examination is curtailed because of a witness's valid claim of privilege, however, the trial court, in its discretion, may refuse to permit that witness's testimony. Just as the trial court must be vigilant in ensuring that a defendant has a full and fair cross-examination, it must similarly safeguard the government's cross-examination "to prevent co-conspirators from 'whitewashing' each other through the use of testimony unchallengeable for one reason or another.

We have recognized that it "may sometimes be feasible for a district court to reconcile the defendant's right to present witnesses with a witness's privilege against self-incrimination by limiting the scope of the latter's testimony. *In striking the appropriate balance between a defendant's Sixth Amendment rights and the government's interest in cross-examination, a "trial judge may or even must limit the government's cross-examination on collateral matters if this can be done without unduly limiting the government and if doing so will preserve the defendant's ability to call a material witness who would otherwise claim the privilege.*

> Where ... a defense witness's claim of privilege shields material testimony from cross-examination, however, this balance weighs against the defendant.[14]

In the case before the Court, the trial court properly conducted a preliminary inquiry into the witness's testimony outside the presence of the jury,[15] and that questioning revealed that Williams would invoke the privilege as to two (2) questions: (1) "Do you know if Angela took any, or attempted to take any items there at the K–Mart?"; and (2) "Ma'am, what was your involvement?" The question before this Court, therefore, is whether the trial court abused its discretion[16] when it precluded

---

**13.** *Denham v. Deeds, supra* note 6 at 1504 (citations omitted). *See also United States v. Esparsen, supra* note 6 at 1469 ("A defendant cannot invoke due process or compulsory process rights to immunize his witnesses from cross-examination on issues relevant to the truth of the direct testimony."); *Lawson v. Murray, supra* note 6 at 655–656 ("Neither a defendant's right of confrontation nor his right to present witnesses in his own defense is so absolute as to require a subversion of more fundamental principles that animate our adversary system.").

**14.** *United States v. Gary, supra* note 6 at 310 (emphasis added and citations omitted).

**15.** *See* KRE 103(c); KRE 104. *See also Denham v. Deeds, supra* note 6 at 1503 (characterizing such a preliminary inquiry as a "dry run"). *Cf. Commonwealth v. Gettys, supra* note 3 at 901 ("In this case it was never determined precisely what the questions were going to be.").

**16.** *See United States v. Esparsen, supra* note 6 at 1469 ("Unless the trial court has abused its discretion, we will not disturb its decision to strike testimony because of restricted cross-

Williams from testifying because she would invoke her privilege as to these two (2) questions.

■ During arguments at the bench on its motion to preclude Williams's testimony, the Commonwealth asserted that it would be "unfairly prejudiced by not being able to ask them why they were there and what they were doing there, what was their vantage point, things of that nature." Of course, the purpose of the "dry run" of Williams's testimony was to preview the questions and responses and to allow the trial court to determine whether it could accommodate Williams's valid assertions of privilege without impairing the Commonwealth's ability to test the truthfulness of the testimony through cross-examination. A "dry run" also allows meaningful appellate review by creating a record of the questions that the witness will answer as well as those questions as to which the witness intends to invoke her privilege against self incrimination. Accordingly, the parties should endeavor for a complete examination. In any event, we find it improper to simply *assume* that Williams would invoke the privilege as to questions she was never asked. While a defendant's Sixth Amendment right to compulsory process must yield to *legitimate* demands of the adversarial process, a witness should not be precluded from testifying based on speculation about whether he or she would invoke a privilege.

Initially, we note that the reason given by the trial court at the time of its ruling— "[S]imply by taking the stand, this witness would have to waive her Fifth Amendment privileges and we can't piecemeal what she

is going to waive and what she is not going to waive"—suggests that the trial court treated Williams's invocation of the privilege against self-incrimination as an "all-or-nothing" decision that barred the witness from testifying at all. Further, the record provides no evidence that the trial court even considered whether it could permit Williams to testify and limit the scope of the Commonwealth's cross-examination without prejudicing the Commonwealth's ability to test the truth of Williams's testimony. Because there is no indication that the trial court exercised its discretion in this matter, we believe it erred when it precluded Williams from testifying.

In addition, it appears that the trial court could have accommodated Williams's privilege without impairing the Commonwealth's ability to test the veracity of Williams's testimony through cross-examination. While we recognize that one of the primary means to uncover untruths through cross-examination is to question a witness concerning the details of his or her testimony,[17] the particular details upon which Williams intended to invoke her privilege—i.e., whether she and Appellant had shoplifted or attempted to shoplift merchandise at K–Mart that afternoon— were neither necessary to a probing cross-examination nor particularly probative as to Williams's truthfulness. In fact, if the Commonwealth intended to expose Williams's testimony as false, the *very last thing* it would want to do is *enhance* Williams's credibility by asking Williams to admit that she, too, had been shoplifting and underscoring the fact that Williams's testimony was against her own interests.

examination."); *United States v. Gary, supra* note 6 at 311 ("We discern no abuse of discretion in the trial court's determination that the subject matter of the cross-examination as to which Hopkins would have asserted his privilege was material and relevant.").

**17.** *See United States v. Esparsen, supra* note 6 at 1470; *Denham v. Deeds, supra* note 6 at 1503; *Lawson v. Murray, supra* note 6 at 655.

Williams's testimony was important for the defense because it suggested that Appellant was not at her home selling crack cocaine on the date alleged by the Commonwealth. Williams's own conduct during that time was only tangentially related to the essence of her testimony, and her invocation of the privilege with respect to questions of whether she committed a crime or assisted Appellant's commission of a crime neither prevented the Commonwealth from inquiring as to matters going "to the heart of" her direct testimony nor constituted a refusal to be cross-examined. Specifically, the Commonwealth could have scrutinized Williams's truthfulness by asking Williams for further information concerning the K–Mart trip [18] or by investigating the relationship between Williams and Appellant in order to discover whether that relationship provided a motive for Williams to testify untruthfully. Because the Commonwealth would have had ample opportunity to test the credibility of Williams's testimony without addressing the questions as to which Williams properly could have invoked her privilege against self-incrimination, the trial court erred when it precluded Williams from testifying.

■ We find no merit in the Commonwealth's contention that the trial court's exclusion of Williams's testimony was harmless. Although some questions might remain as to the timing of Appellant's detention at K–Mart, Williams's testimony tended to cast doubts upon the Commonwealth's evidence that Appellant sold cocaine to a confidential informant at her home on the afternoon of October 31, 1996. As such, this evidence would have brought into question the credibility and/or accuracy of identification testimony from both the confidential informant and Detective Pete Ford and bolstered the credibility of Appellant's alibi witness for the other transaction on November 5, 1996. Had the fact-finder been permitted to consider Williams's testimony, it may very well have reached a different verdict. Under the facts of this case, we cannot conclude that the trial court's erroneous decision to preclude Williams from testifying in Appellant's defense constituted harmless error.[19]

## IV. CONCLUSION

For the above reasons, we reverse Appellant's convictions and sentences and remand Fayette Circuit Court Indictment No. 97–CR–0235 to the trial court for retrial. If upon retrial, Appellant again intends to call Williams as a witness in her defense, the trial court should first determine whether Williams still has a valid claim of privilege.[20] If so, the trial court

---

18. We note that Williams did answer the second question asked of her by the Commonwealth during the "dry run" cross-examination—"Did Ms. Combs drive there with you present in the car?" A number of other potential topics for cross-examination also come to mind, e.g.: (1) How long were you at K–Mart with Ms. Combs?; (2) Approximately what time did you arrive at K–Mart?; (3) Approximately what time did you leave K–Mart?; (4) How did you get home from K–Mart?; (5) What items were you shopping for?; (6) Did you and Ms. Combs shop together, or separately?; (7) What did you purchase, if anything?; (8) Do you have any receipts with you to demonstrate that you purchased anything at K–Mart on that occasion?; (9) What did Ms. Combs purchase, if anything?; (10) Did you observe Ms. Combs being detained?; (11) Where were you when you observed Ms. Combs being detained?; (12) Could you describe for the jury the person or persons who detained Ms. Combs?; (13) How long was Ms. Combs detained?

19. *See Abernathy v. Commonwealth*, Ky., 439 S.W.2d 949 (1969).

20. We note that Williams's appointed counsel represented to the trial court that Williams's actions could constitute a Class A or Class B

should limit the scope of Williams's examination to topics upon which she cannot validly assert the privilege unless the Court finds that to do so would substantially impair the Commonwealth's ability to test the veracity of Williams's testimony through cross-examination.

LAMBERT, C.J.; COOPER, GRAVES, JOHNSTONE and STUMBO, concur.

WINTERSHEIMER, J., dissents by separate opinion.

WINTERSHEIMER, Justice,
Dissenting.

I must respectfully dissent from the majority opinion because the legal principle asserted in *Clayton v. Commonwealth*, Ky., 786 S.W.2d 866 (1990), that "Neither the prosecution nor the defense may call a witness knowing that the witness will assert a Fifth Amendment privilege against self-incrimination" absolutely controls this situation.

The learned legal essay presented by the majority relies on a decision by a panel of the Court of Appeals in *Commonwealth v. Gettys,* Ky.App., 610 S.W.2d 899 (1981) and federal court decisions. Here, the claim of privilege was not too remote or speculative as in *Gettys, supra.*

The majority acknowledges that the federal courts have addressed analogous issues in three different contexts. However, the noble efforts to avoid the application of *Clayton, supra,* are unavailing. The Kentucky case controls and should be followed. The trial judge correctly ruled that the witness could either take the stand and testify fully or refuse to testify on Fifth Amendment grounds. As correctly noted by the trial judge, there is no federal

constitutional right to call a witness whom counsel knows will exercise her Fifth Amendment privilege. *See United States v. Crawford,* 707 F.2d 447 (10th Cir.1983).

A criminal defendant has the right under the Sixth Amendment to subpoena witnesses to testify in his behalf. However, the Sixth Amendment to the federal constitution involves a right to confrontation which must yield when a witness properly asserts his own Fifth Amendment right against self-incrimination. The right to impeach a witness through vigorous cross-examination is subordinate to a properly presented Fifth Amendment privilege against self-incrimination. *See Alford v. United States,* 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931). The Fifth Amendment is superior to the Sixth, that is why it is Fifth and not Sixth or later. The Bill of Rights is a carefully conceived legal document and the priority of position should not be ignored. An extended discussion of the right against self-incrimination by witnesses may be found in 81 Am.Jur.2d *Witnesses* §§ 87, 88.

Here, the defendant did not have the right to call a witness who would selectively determine which questions she would answer and which questions she would not answer. Such a situation would deprive the Commonwealth of the ability to effectively cross-examine such a witness. It is obvious that in such a condition the witness would be able to testify favorably regarding matters helping the defendant but could refuse to testify regarding matters unfavorable to the defense. Thus, both federal and state courts have ruled that such a witness may not testify, and accordingly, the trial judge here correctly refused to allow the witness to testify.

misdemeanor offense, and we recognize that, during the time this case has been on appeal, the statute of limitations for prosecuting such offenses may have run. *See* KRS 500.050(2)

("Except as otherwise expressly provided, the prosecution of an offense other than a felony must be commenced within one (1) year after it is committed.").

The trial judge and this panel of the Kentucky Court of Appeals was correct when it affirmed her ruling. *Clayton* controls and should be followed.